Law Firm of
## Susan K. Marcus, LLC
29 Broadway, Suite 1412, New York, NY 10006
T: 212-792-5131 ◆ F: 888-291-2078 ◆ E: susan@skmarcuslaw.com

January 27, 2020

Honorable Jed S. Rakoff
Senior United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

In re: *United States v. Marmolejo*, 20-CR-1

Dear Honorable Judge Rakoff:

This letter constitutes the sentencing submission on behalf of Victor Marmolejo, whom I represent by CJA appointment in the above-entitled case. For the reasons set forth below, it is respectfully requested that Mr. Marmolejo be sentenced to time served.

The reasons supporting such a sentence, detailed below, are as follows:

(1) Analysis of the factors enumerated in 18 U.S.C. §3553(a)(1)-(7) establishes that a sentence other than that prescribed by the Sentencing Guidelines is "sufficient, but not greater than necessary" in this case in order to achieve the purposes of sentencing set forth in §3553(a)(2). In particular, the following factors are pertinent to the Court's consideration:

    a.  Mr. Marmolejo's background and character;

    b.  Mr. Marmolejo's harsh conditions of confinement in pretrial detention;

    c.  The unnecessary risks prison poses to Mr. Marmolejo's health, particularly during the COVID-19 crisis;

    d.  Mr. Marmolejo's acceptance of responsibility and the nonviolent nature of the offense conduct;

    e.  Mr. Marmolejo's exemplary time in pretrial detention, despite the harsh conditions; and

    f.  Mr. Marmolejo's criminal history category is overstated.

(2) A sentence of incarceration would not rehabilitate Mr. Marmolejo under 18 U.S.C. § 3582(a), and is not necessary to achieve the sentencing goals under 3553(a)(2).

1

I.    *Sentencing Factors Under 3553(a)*

For the entire 13 months Mr. Marmolejo has been at the MCC since his arrest, he has endured exceptionally harsh conditions, only to face certain deportation upon completion of his sentence. The defense respectfully requests that the Court impose a sentence of time served. As set forth below, an examination of the relevant factors under 18 U.S.C. §3553 justifies the below-Guidelines sentence sought.

a.    *Mr. Marmolejo's Background and Character*

Mr. Marmolejo was born on January 16, 1974 to Cecilia Restrepo and Edison Marmolejo in Cali, Colombia. He has one younger sibling, sister Tatiana Marmolejo. His mother has one son, Jhon Restrepo, and his father has two sons, Diego and Carlos Marmolejo, from prior relationships. Although the youngest boy in his family, in many ways Mr. Marmolejo was the child burdened with the most responsibility to care for his family.

Mr. Marmolejo grew up in Cali until the mid-1980's, when his family immigrated to the United States. Cali was a very dangerous place in the 1980's. There were ongoing wars among the drug traffickers and guerillas, replete with bombings and killings. Mr. Marmolejo personally witnessed fatal shootings on multiple occasions as a child. Once, when he was on his way home from school, he witnessed a person drive by on a motorcycle and shoot someone dead in front of a restaurant. Another day, while playing soccer, he witnessed a shooting of one of the players. He watched as the victim was shot but still alive, only to be shot again to death when the shooter came back to make sure he was dead. These incidences were very difficult for Mr. Marmolejo to witness, but unfortunately were not uncommon to see in Colombia. In 1989, the Los Angeles Times noted that "Like an unwelcome stranger brought aboard an already overcrowded boat, the violence unleashed by drug trafficking in recent years has brought Colombia close to sinking under the weight of its own bloodshed."[1]

Not only did Mr. Marmolejo experience community violence, but he endured violence at home as well. Mr. Marmolejo struggled in school at times, and rather than get additional support as he needed, his father beat him. If he got poor grades, he was beaten with belts and sticks, and Mr. Marmolejo often had welts and bruises. When he was ten years old, he had to repeat a year in school because he had trouble retaining what he learned. His father beat him severely as a result. His father also punched his mother, and it was particularly bad when he was drunk. At a young age, Mr. Marmolejo had to confront his father so that he would no longer hit his mother; his brothers did not, as she was not their mother.

In an effort to escape the violence, in 1986, Mr. Marmolejo and his family came to the United States. He arrived with his father, younger sister, and two older half-brothers. They had green cards, sponsored through Mr. Marmolejo's aunt on his father's side, and lived in Queens, New York. Mr. Marmolejo's mother would not come to the United States until later, as his mother had to clear up paperwork from a previous divorce to obtain her green card.

---

[1] James F. Smith, "Colombia's Violence: From Bad to Worse," *THE LOS ANGELES TIMES*, Sept. 25, 1989, available at https://www.latimes.com/archives/la-xpm-1989-09-25-mn-171-story html.

In Colombia, Mr. Marmolejo's family had been able to work, earn enough money to eat, and live humbly in a home. His father owned a trucking company and his mother owned a restaurant left to her by her parents. This changed when the family immigrated to the United States. Mr. Marmolejo's parents had a much more difficult time making money in the United States than they did in Colombia. The family had more financial security in Colombia, but their safety was constantly threatened. Mr. Marmolejo valued the physical security in the United States, but the sacrifice of financial security meant that he had to start working at a young age to help supplement his parents' income. He began working at a grocery store part-time soon after he arrived in the United States.

Coming to America created additional stressors for Mr. Marmolejo and his family. Work was scarce and low paid; his father was unable to earn enough money to support the family. When Mr. Marmolejo was just fourteen, shortly after arriving in the United States, his father was arrested and jailed in New York on drug charges. Mr. Marmolejo's mother was not yet in the United States.

Mr. Marmolejo and his two half-brothers had to then live with their aunt. Mr. Marmolejo's older brothers were able to remain with her; however, Mr. Marmolejo, who was younger and needed more support and supervision, which she was unable to provide, had to find another place to live. He ended up staying with a friend of his father's, and felt abandoned by his family.  Mr. Marmolejo's father ultimately plead guilty to a drug charge and was sentenced to several years in prison. This cascade of disruptions to Mr. Marmolejo's life during his adolescence was very difficult for him, particularly because he did not have an adult who could help him cope and support him, financially and emotionally. Although Mr. Marmolejo had always loved school, the trauma he endured in his life, both in Colombia and in the United States, caused him to suffer academically.

Around this same time, Mr. Marmolejo, still a new immigrant in the United States, struggled to assimilate in the Astoria neighborhood in Queens in which his family had settled. Back then, in the 1980's, the neighborhood was largely Greek and Italian, and Mr. Marmolejo stood out. Picked on because he couldn't speak English well and had few if any friends, he was beaten up very badly at his high school by multiple schoolmates who ganged up on him when he was alone. He worked very hard to improve his English, and sought out safer and positive relationships. However, these experiences left him without the necessary foundation to become more successful in his new adopted home.

Mr. Marmolejo lived with his father's friend for about 6-8 months. Finally, Mr. Marmolejo's mother arrived in the United States. Even though Mr. Marmolejo is very close with his mother, life was still very difficult for Mr. Marmolejo after her arrival. They lived in a small studio apartment, and his mother had a difficult time finding work in New York. After only about 4-5 months in the city, a friend of his mother's found a babysitting job for her in Miami, Florida. It was the only work she could find, so she and Mr. Marmolejo left New York for Miami. Mr. Marmolejo's little sister, Tatiana, also joined them in Miami, but their mother, unable to find adequate childcare for Tatiana while she worked, ultimately sent Tatiana back to Colombia to live with her grandmother temporarily.

3

The frequent moves and housing instability were very hard on Mr. Marmolejo. This was during his teenage years, when he should have been focusing on school, his own development, and gaining a sense of his identity and accomplishments. Instead, he focused on providing for his struggling family, and being his mother's primary source of support. In Miami, Mr. Marmolejo, his mother and Tatiana lived with his mother's friend at first. Then, when he was around 16, the three of them moved into their own apartment. Moving into their own apartment, and the higher rent that entailed, meant that Mr. Marmolejo had to work even harder to help supplement his mother's babysitting income.

As the youngest man in the family, with his father away in prison, Mr. Marmolejo found himself bearing the enormous responsibility of being the man of the house at a young age, responsible for both his mother and little sister Tatiana. Mr. Marmolejo felt great pressure to earn enough money to survive and provide for his mother and little sister. He worked hard, holding multiple jobs while still in high school in Miami. He worked at Steak and Ale restaurant, and as a lifeguard at a hotel, for about one year, and then, once he was old enough to drive a car, worked at UHaul for his last two years of high school. He worked full time at UHaul while also attending high school. He left school around 4:00pm, took the bus to work, and worked until midnight or one in the morning every day. He gave 90% of the money he made to his mother, saving just enough money for food and transportation to his many jobs. He also provided money for his father's commissary.

Mr. Marmolejo completed high school, graduating from North Miami Beach Senior High School around 1992. Upon graduating, he continued to work at UHaul, as well as at a supermarket, and attended Miami-Dade Community College for one semester. He did not continue on to the next semester because he was unable to work enough hours to earn enough income while also attending college. Mr. Marmolejo has held a number of jobs since then, in construction, as a taxi driver, and most recently, from around 2016 through 2019, doing home renovation work for a contractor who owns a remodeling company in Queens.

Mr. Marmolejo has always enjoyed working hard, and always strove for an honest life. At an early age, he developed an interest in interior design, for which he still holds a passion to this day; it is still his dream to one day have his own interior design business. But early on in his adulthood, Mr. Marmolejo faced increasing personal challenges that for him presented roadblocks to achieving his dreams—in particular, his immigration status and his health conditions. When Mr. Marmolejo was around 22 years old, ███████████████████████████████ ███████████████████████████, especially at such a young age, was devastating to Mr. Marmolejo. It also placed additional financial pressure on Mr. Marmolejo; the additional costs of ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ ██████████████████████████████████ ███████████████████████████████ █████████████████████████.

Shortly after Marmolejo's ████████████, in 1996, Victor was arrested in Miami on Florida state drug charges and spent 12 days in jail before the case was dismissed. He had a green card when he was arrested. He ultimately moved back to New York City with his mother and sister.

In 2005, Mr. Marmolejo was arrested in New York City on a warrant alleging the same crimes as the Florida case that was dismissed nearly a decade earlier in 1996, though this time in Miami federal court. At the time of this arrest, Mr. Marmolejo was only two weeks from an appointment to obtain his citizenship. He was extradited to Miami, and ultimately plead guilty in 2006 to 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate a drug trafficking offense), based on conduct that entirely occurred in the 1990's, and was sentenced to 48 months in prison. He served his sentence at FCI Fort Dix.

While at FCI Fort Dix, ████████████████████████████████████████████████████████████████████████████████████████████████ He also fractured his left shoulder when he fell in a prison bathroom, and he continues to have problems with his shoulder today. He completed his sentence in early 2009.



### b. *Prison Unnecessarily Risks Mr. Marmolejo's Health, and Life, During the COVID-19 Crisis*

Since Mr. Marmolejo's arrest in this case in December 2019, the world has been turned upside down by the wholly unexpected and unprecedented global COVID-19 pandemic. Now more than 10 months into the pandemic, it shows no signs of abating, with the United States continuing to hit new daily death records.[2] In American jails and prisons, more than 510,000 people have been infected and at least 2,200 prisoners and correctional officers have died.[3] The

---

[2] *See* Karen Zraick & Rebecca Robbins, *As U.S. tops 4,000 deaths in a day, a record, Fauci warns that January will get harder*, N.Y. Times (Jan. 7, 2021), https://www.nytimes.com/live/2021/01/07/world/covid-19-coronavirus.
[3] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

federal BOP system, "America's largest network of prisons and jails," is particularly vulnerable to the spread of infection as prisoners continue to be transferred across state lines, to and from far-flung locales around the country, including in and out of the New York area.[4]

Indeed, of the 12 Federal Correctional Institutions in the BOP's Northeast Region, all but one have experienced COVID-19 outbreaks, most notably the well-publicized and lethal outbreak at FCI Elkton in Ohio. Nearly 1,000 prisoners at FCI Elkton (more than half of the prisoner population there) have tested positive, and nine have died due to COVID-19.[5] The outbreaks at FCI Danbury in Connecticut and FCI Fairton in New Jersey have also been lethal, with one prisoner death at each prison due to the virus.[6] 192 prisoners and 79 staff have tested positive at FCI Danbury, [7] and 283 prisoners and 43 staff have tested positive at FCI Fairton.[8] The one Federal Medical Center in the BOP's Northeast Region, FMC Devens, has experienced a lethal outbreak of COVID-19 resulting in the deaths of *eight* prisoners at the facility.[9] FCI Fort

---

[4] *See* Keegan Hamilton & Keri Blakinger, *'Con Air' Is Spreading COVID-19 All Over the Federal Prison System*, The Marshall Project (Aug. 13, 2020), available at https://www.themarshallproject.org/2020/08/13/con-air-is-spreading-covid-19-all-over-the-federal-prison-system ("[P]artly due to federal courts and law enforcement agencies pumping thousands of new people into the system" throughout the pandemic, COVID-19 has "wreak[ed] havoc across the Bureau of Prisons, . . . America's largest network of prisons and jails.").

[5] *See* Keri Blakinger & Keegan Hamilton, "I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps, The Marshall Project (June 18, 2020), available at https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps. As of January 21, 2021, the BOP reports these current numbers for FCI Elkton: 5 inmates positive, 29 staff positive, 9 inmate deaths, 867 inmates recovered, and 56 staff recovered. https://www.bop.gov/coronavirus/. As of September 15, 2020, the BOP had reported 960 inmates recovered at FCI Elkton. It is important to remember that the BOP's reported positive test numbers do not reflect the actual number of inmates and staff at each facility that have been, and/or currently are, infected with COVID-19. At many of its facilities, the BOP has only tested a small percentage of inmates and staff, based on its own, sometimes seemingly arbitrary, criteria for when testing of an individual is warranted. When the BOP finally got around to increasing its testing capabilities months into the pandemic, the results revealed that more than 35% of tested federal prisoners were positive for the virus. *See* Luke Barr, But just 1 out of 3 tested federal inmates were positive for coronavirus, ABC News (June 16, 2020), available at https://abcnews.go.com/Politics/tested-federal-inmates-positive-coronavirus/story?id=71275461 ("The [BOP] says that of its 16,839 tested inmates, 6,060 have tested positive. In total, the BOP has tested more than 18,000 of its 163,441 federal inmates, with results pending in more than 2,300 cases.").

[6] *See* Edmund H. Mahony, Danbury prison inmates settle with Bureau of Prisons in suit over COVID threat, Hartford Courant (July 27, 2020), available at https://www.courant.com/coronavirus/hc-news-coronavirus-danbury-prison-covid-settlement-20200727-20200727-lsvka64asbf53do6raygr2j7vm-story.html ("The inmates sued in late April when corona virus transmissions were at crisis levels in the northeast and Danbury was among the hardest hit in the Federal Bureau of Prison system. By early May, about 60 inmates and 50 staff members had contracted the disease and one inmate has died.").

[7] As of January 21, 2021, the BOP reports these current numbers for FCI Danbury: 2 inmates positive, 1 inmate death, 190 inmates recovered, and 78 staff recovered. https://www.bop.gov/coronavirus/.

[8] As of January 21, 2021, the BOP reports these current numbers for FCI Fairton: 26 inmates positive, 26 staff positive, 1 inmate death, 257 inmates recovered, and 17 staff recovered. https://www.bop.gov/coronavirus/.

[9] *See* Lauran Crimaldi, Trahan, McGovern urge action over COVID-19 outbreak at Devens federal prison, BOSTON GLOBE (Jan. 5, 2021), available at https://www.bostonglobe.com/2021/01/05/nation/trahan-mcgovern-urge-action-over-covid-19-outbreak-devens-federal-prison/; *see also* Joan Eliyesil, COVID-19 claims life at Devens prison, staff members test positive, THE HARVARD PRESS (May 14, 2020), available at https://harvardpress.com/News/News-Articles/ArtMID/4510/ArticleID/20936/COVID-19-claims-life-at-Devens-prison-staff160members-test-positive ("Because of the frailty of many inmates there, FMC Devens has recently come under fire for not following U.S. Attorney General William Barr's April 3 memo directing prisons to identify inmates with COVID-19 risk factors and consider releasing them to home confinement."); Brian Dowling, Mass.

Dix in New Jersey, where Mr. Marmolejo served his previous federal prison sentence from 2006 to 2009, has also seen multiple outbreaks.[10] In a recent letter to the warden at FCI Fort Dix, Senators Cory Booker and Robert Menendez expressed "serious concerns" regarding "overall conditions at FCI Fort Dix, especially in light of the alarming rate of COVID-19 cases at the facility in recent weeks":

> The conditions at facilities in New Jersey, specifically your facility, have grown increasingly worrisome. . . . The Centers for Disease Control and Prevention guidance says to avoid large gatherings and social distance, however, the conditions of confinement do not allow incarcerated individuals to engage in many of the recommended precautions necessary to propery protect themselves. In fact, we know that individuals are grouped in cohorts that could include hundreds of people in close proximity to each other throughout the day. Due to the ease and speed with which COVID-19 can spread, we must ensure that facilities are safe and clean for those who aren't released to home confinement. For those individuals who have tested positive for the virus and require medical care, we have serious concerns about whether the medical care available on-site can adequately treat this complex virus.[11]

The other FCI's in the region with COVID-19 outbreaks include both FCI Allenwood Low and Medium in Pennsylvania,[12] FCI Loretto in Pennsylvania,[13] FCI McKean in

---

Federal Prison A COVID-19 "Powder Keg," Suit Claims, Law 360 (Apr. 15, 2020), available at https://www.law360.com/articles/1263888/mass-federal-prison-a-covid-19-powder-keg-suit-claims. As of January 21, 2021, the BOP reports these current numbers for FMC Devens: 77 inmates positive, 16 staff positive, 8 inmate deaths, 310 inmates recovered, and 45 staff recovered. https://www.bop.gov/coronavirus/.

[10] *See* Colleen O'Dea, COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/ ("At federal facility at Fort Dix, social distancing is impossible, masks are in scant supply and visibly ill prisoners continue to work — while 40 inmates and three staff have tested positive for COVID-19"); Joe Atmonavage, "I think I am going to die." Inside a coronavirus outbreak at a N.J. federal prison, NJ.com (Oct. 29, 2020), available at https://www.nj.com/news/2020/10/i-think-i-am-going-to-die-inside-a-coronavirus-outbreak-at-a-nj-federal-prison.html. As of January 21, 2021, the BOP reports these current numbers for FCI Fort Dix: 120 inmates positive, 29 staff positive, 1,308 inmates recovered, and 45 staff recovered. https://www.bop.gov/coronavirus/.

[11] Jan. 12, 2021 Letter from Senators Cory Booker and Robert Menendez to FCI Fort Dix Warden David Ortiz, available at https://www.booker.senate.gov/imo/media/doc/1.12.21%20-%20BOP%20Letter%20to%20Fort%20Dix%20COVID-19%20Outbreak%20FINAL%20SIGNED.pdf.

[12] As of January 21, 2021, the BOP reports these current numbers for FCI Allenwood Medium: 42 inmates positive, 31 staff positive, 525 inmates recovered, and 14 staff recovered; and these numbers for FCI Allenwood Low: 5 inmates positive, 14 staff positive, 258 inmates recovered, and 2 staff recovered https://www.bop.gov/coronavirus/.

[13] *See* Randy Griffith, Loretto federal prison sees outbreak spike as Cambria County reports record 30 new COVID-19 cases, The Tribune-Democrat (Aug. 6, 2020), available at https://www.tribdem.com/coronavirus/loretto-federal-prison-sees-outbreak-spike-as-cambria-county-reports-record-30-new-covid-19/article_1d22ef5e-d736-11ea-b2c9-f7cb4e508a04.html ("An apparent outbreak at the federal prison in Loretto appears to have driven Cambria County's 30-case surge in COVID-19 cases as reported on Wednesday."); DOH: Outbreak at FCI Loretto contributes to surge in Cambria County's COVID-19 cases, WJAC (Aug. 6, 2020), available at https://wjactv.com/news/local/doh-

Pennsylvania,[14] FCI Otisville in New York,[15] "quarantine site" FCI Ray Brook in New York,[16] and FCI Schuykill in Pennsylvania.[17] This Court, in denying the government's request for revocation of bail and detention of a defendant who pleaded guilty to crimes of violence, specifically conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, acknowledged that "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."[18]

███████████████████████████████████ █ █████████████████████████
████████████████████████████████████████████████████████████████████,[20]

---

[outbreak-at-fci-loretto-contributed-to-surge-in-cambria-countys-covid-19-cases](https://) ("Pennsylvania's health department confirmed Thursday that a COVID-19 outbreak at Federal Correctional Institution Loretto has contributed to Cambria County's recent spike in cases. The Bureau of Prisons is reporting 40 inmate and seven staff cases at FCI Loretto, but the exact number of current cases isn't clear . . . ."). As of January 21, 2021, the BOP reports these current numbers for FCI Loretto: 1 inmate positive, 16 staff positive, 714 inmates recovered, and 47 staff recovered. https://www.bop.gov/coronavirus/.

[14] As of January 21, 2021, the BOP reports these current numbers for FCI McKean: 79 inmates positive and 224 inmates recovered. https://www.bop.gov/coronavirus/.

[15] Liliana Segura, As Virus Spreads in Federal Prisons, People Inside Describe Chaos, While Families Are Left In The Dark, The Intercept (Apr. 15, 2020), available at [https://theintercept.com/2020/04/15/federal-prisons-coronavirus/](https://theintercept.com/2020/04/15/federal-prisons-coronavirus/) ("The attempts at social distancing [at FCI Otisville] were futile. In the medium-security facility where Carrillo was housed, men were double-bunked, with more than 100 people per unit."). As of January 21, 2021, the BOP reports these current numbers for FCI Otisville: 3 inmates positive, 6 staff positive, 24 inmates recovered, and 15 staff recovered. https://www.bop.gov/coronavirus/.

[16] See Harry August & Alex Garnick, "The Situation Here Is Dire": How an Upstate New York Prison Failed to Contain a COVID-19 Outbreak, The Marshall Project (Apr. 16, 2020), available at [https://theappeal.org/coronavirus-upstate-new-york-prison-failed-to-contain-outbreak/](https://theappeal.org/coronavirus-upstate-new-york-prison-failed-to-contain-outbreak/) ("FCI Ray Brook was slow to respond to the spread of coronavirus among correctional officers. Now the outbreak has reached prisoners."); Aaron Cerbone, Five new COVID-19 cases reported at federal prison in Ray Brook, The Post Star (June 23, 2020), available at [https://poststar.com/news/state-and-regional/five-new-covid-19-cases-reported-at-federal-prison-in-ray-brook/article_e23008b2-f218-504c-a4da-85a2cf0688c2.html](https://poststar.com/news/state-and-regional/five-new-covid-19-cases-reported-at-federal-prison-in-ray-brook/article_e23008b2-f218-504c-a4da-85a2cf0688c2.html) ("Corrections officer union leaders said delayed action from the BOP caused this spread, which landed one CO in the hospital on a ventilator for 21 days. In May, the BOP announced plans to move thousands of new U.S. Marshals Service inmates to quarantine sites at federal prisons around the country — including FCI Ray Brook."). As of January 21, 2021, the BOP reports these current numbers for FCI Ray Brook: 85 inmates positive, 11 staff positive, 48 inmates recovered, and 25 staff recovered. https://www.bop.gov/coronavirus/.

[17] As of January 21, 2021, the BOP reports these current numbers for FCI Schuykill: 81 inmates positive, 14 staff positive, 171 inmates recovered, and 5 staff recovered. https://www.bop.gov/coronavirus/.

[18] United States v. Lopez, No. 19 Cr. 323 (JSR) (S.D.N.Y. March 26, 2020).

[19] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████

[20] See People with Certain Medical Conditions, Centers for Disease Control and Prevention, [https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html](https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html) (last updated Dec. 29, 2020); Vanderbilt University Medical Center, Researchers urge priority vaccination for ████████████████, Science Daily (Dec. 4, 2020), https://www.sciencedaily.com/releases/2020/12/201204131321.htm ("Vanderbilt University Medical Center





### c.  Mr. Marmolejo's Harsh Conditions of Confinement in Pre-Trial Detention

Substandard pretrial housing conditions have long been considered relevant to determine a sentence. It has been established, particularly in this Circuit, that courts can grant sentencing relief in the form of downward departures and variances based upon unduly harsh treatment in custody.[36] The rationale behind the basis of such relief, whether expressed or implied in published opinions, has been two-fold: the first is one of equitable compensation for excessive hardship by treating both suffering and time as components of punishment and reducing the time component of the defendant's sentence accordingly. The second is the need to deter those correctional authorities within the courts' jurisdiction from causing or tolerating the abhorrent conditions that produced such excessive punishment in the first place.

Before the COVID-19 pandemic, a number of Judges in this District had recognized the horrendous conditions at the MCC and provided downward departures at sentencing for defendants who have been detained there. *See, e.g., United States v. Saldana*, 17 Cr. 512 (KMW), Dkt. No. 535, at 16-17 (S.D.N.Y. Sept. 10, 2019) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that."); *United States v. Behr*, 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) (Sweet, J,) (recognizing harsh conditions at MCC were unacceptable pretrial punishment and sentencing defendant below Guidelines). A video taken in 2019, but released

---

and ensure that high-risk patients receive adequate care."); *Chunn v. Edge*, No. 20-cv-1590 (RPK), _F.Supp.3d_, 20 WL 3055669, at *17-18 (E.D.N.Y. June 9, 2020) (finding that medical staff at MDC "take days or even weeks to respond to some sick-call requests reporting COVID-19 symptoms," even when those reports include "trouble breathing.").

[36] *See, e.g., United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased"); *United States v. Francis*, 129 F. Supp.2d 612, 619-20 (S.D.N.Y. 2001) (granting downward departure pursuant to Section 3553(b) to an inmate who had suffered "harsher incarceration" consisting of "extraordinary stress and fear" under "qualitatively different, substandard conditions" for the extended period he spent before sentencing in a State holding facility); *United States v. Carty*, 264 F.3d 191 (2d Cir.2001) (holding, *per curiam*, that abnormally harsh presentence conditions can be grounds for a downward departure); *United States v. Torres*, 2005 WL 2087818, at*2 (S.D.N.Y. Aug. 30, 2005) (McKenna, J.) (downwardly departing because the "enhanced deprivations . . . and suffering" by the defendant who was held in pretrial detention in Colombia would produce a "magnitude of punishment effectively disproportionate"); *United States v. Mateo*, 299 F.Supp.2d 20l (S.D.N.Y. 2004) (Marrero, J.) (downwardly departing nine levels where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); *United States v. Speed Joyeros*, 204 F. Supp. 2d 412, 441 (E.D.N.Y. 2002) (Weinstein, J.) (downwardly departing because of, *inter alia*, "the physical deterioration of the defendant" while in pretrial custody); *United States v. Roseboro*, 402 Fed. Appx. 657, at *2 (2d Cir. 2010) (district court properly discharged its procedural obligations under 3553(a), including considering harsh pretrial conditions, before imposing sentence); *United States v. Fajardo*, 2006 WL 3498640 at *3- 4 (S.D.N.Y. Dec. 5, 2006) (Sweet, J.) (taking note of substandard pretrial conditions under § 3553(a) for purposes of determining proper sentence). While most of these cases granted "departures," the grounds asserted in those instances also provide justification for "variances" under 18 U.S.C. §3553(a). Among the 3553(a) sentencing factors implicated here are "just punishment" under 3553(a)(2)(A) and "[needed] correctional treatment" under 3553(a)(2)(D).

last year by the Daily News, shows some of those horrific conditions, including rodents, mold and overcrowding in tight quarters.[37]

      **i.**      ***Mr. Marmolejo's*** ███████████████████ *– December 2019 through January 2020*

Mr. Marmolejo entered the MCC on December 12, 2019, ██████████████



---

[37] *See* Stephen Rex Brown, *SEE IT: Contraband Video Gives Rare Look at 'Disgusting' Conditions Inside Manhattan Federal Jail*, The Daily News (Apr. 27, 2020), available at https://www.nydailynews.com/new-york/ny-mcc-video-disgusting-conditions-20200427-7jnmpcbnovasphw32cm3pj677q-story.html ("A video secretly filmed by an inmate at the troubled Metropolitan Correctional Center reveals cramped sleeping quarters and poor hygiene that critics say has turned the jail into a coronavirus petri dish.").



ii.      *The Gun Lockdown – February 2020*

was immediately followed by a traumatic lockdown of the MCC due to a smuggled gun that a former BOP warden called a "monumental lapse" in security.[38] The lockdown began on February 27, 2020, and lasted for

---

[38] Stephen Rex Brown, *Strip searches, frozen bologna sandwiches and wrecked cells: MCC inmates detail lockdown due to smuggled gun*, New York Daily News (Mar. 6, 2020), available at https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306-aws7qoa7ejcozai3i64hms73qi-story html.

several weeks; legal visits were denied.[39] The MCC "inmates' descriptions of strip searches, cold food and clothes washed in toilets were shared with the Daily News as the Bureau of Prisons confirmed an eight-day search had uncovered a loaded firearm in a housing area."[40] As one man described, "a SWAT team came and made everyone lie down on the floor. Inmates were taken one at a time to be strip-searched, and then brought to the visiting room while the guards tore the place apart, left everything a mess and broke the urinal. . . . Other inmates' sheets and blankets were taken. No one has had clean clothes . . . ."[41] ███████████████████████

When the gun lockdown began at MCC, Mr. Marmolejo was housed in 7-N. While the lockdown was still in place, everyone in 7-N was moved to 5-N, and Mr. Marmolejo later learned that they were moved because the gun had been found in 7-N. For nine days in 7-N during the lockdown, Mr. Marmolejo had no access to a shower, computer, or phone, and he spent another week on lockdown in 5-N. ████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████

### iii.   Prolonged and Ongoing Lockdowns, Deprivation, and Extraordinary Stress and Fear Due to the COVID-19 Pandemic – March 2020 through the Present

The gun lockdown of late February through early March 2020 ended only to make way for the onset of the wholly unprecedented COVID-19 pandemic. The MCC has responded since the start of the pandemic with seemingly endless lockdowns that continue through the present, with no end in sight. The lockdowns result in brutally cruel and isolating conditions. The horrors that people incarcerated during the pandemic have experienced throughout the country are well documented. Mr. Marmolejo's own experience has been particularly traumatic, given that he ████████████████████████████████████████████████████████████ █████████████████████████████████████████. Given the magnitude of horrors endured by those detained at the MCC during this unprecedented pandemic, it is not surprising that courts in this District have reduced the lengths of sentences on the basis of the unduly harsh pretrial conditions suffered by those defendants.[42]

At the onset of the pandemic, Mr. Marmolejo was quarantined in the SHU for 20 days, from March 20 through April 9, 2020. The jail put him in quarantine after he had gone to court and was held there with someone who had tested positive; everyone who went to court that day, about 14-16 people, was put in quarantine. Mr. Marmolejo consistently refers to these 20 days in the SHU, during which he lost 25 pounds, as among the hardest days of his life. Conditions in

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *See, e.g., United States v. Morgan,* 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting sentence to less than half of low end of stipulated guidelines based in part on conditions at MDC during pandemic, and condemning awful conditions at both MCC and MDC even prior to current crisis); *United States v. Casillas*, No. 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).

quarantine shock the conscience. The toilet in his cell didn't work. He had no access to a shower for more than a week. There was no light. While in quarantine, there were two days in a row where he didn't ██████████. For these two days, he repeatedly told the CO that ██

████████████████████████████████████████████████████████████████████████████

He had no one to turn to for help, because he was unable to call his family or even his lawyer for more than two weeks. Only on day 17 of his quarantine was he able to use the phone, but only because his lawyer had called him; his family had been worriedly looking for him. Mr. Marmolejo's 20 days in the SHU felt like a death sentence for him. He was never tested in quarantine, but in his isolation and fear he got to the point where he believed he had the virus. ██

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Being released from SHU quarantine was an enormous relief for Mr. Marmolejo, but every month of his incarceration since then has been marked by constant lockdowns and persistent new COVID-19 infections at the jail. The lack of control those incarcerated at MCC have over their conditions and self-protective measures is a source of exceptional and persistent stress and fear. Most of the officers at MCC often do not wear masks, or do not wear them appropriately, and it was not until May 2020 that Mr. Marmolejo was finally provided his own mask. To this day, he has only been provided this one mask, a flimsy cloth one that counsel has witnessed in person drooping down Mr. Marmolejo's face due to its low quality. It is a reusable, washable mask, but because he only has one mask, he is left maskless and exposed during the time it must be washed and dried.

The exceptional stress, anxiety, and fear Mr. Marmolejo has lived in for nearly 11 months now due to the pandemic, and MCC's disorganized and knee-jerk response to it, cannot be understated. Counsel has maintained frequent contact with Mr. Marmolejo throughout the pandemic since being appointed in May 2020. In an effort to provide the Court a sense of the constant lockdowns, deprivation, and maddening uncertainty Mr. Marmolejo has lived in day to day, and week to week, for 10 long months now, counsel provides the below sample of what Mr. Marmolejo has reported to counsel about his conditions of his confinement due to COVID-19.







### iv.    *COVID-19 Continues to Present Inhospitable Conditions*

For nearly eleven long months now, Mr. Marmolejo has been suffering through an unprecedented challenge, to say the least. Conditions at the MCC during the COVID-19 pandemic have been particularly problematic. But perhaps the greatest challenge lies ahead for Mr. Marmolejo if he receives additional incarceration.

18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." During the COVID-19 crisis, courts have been examining this requirement in a new way. Lengthy prison sentences – according to statutory mandatory minimums, in unsanitary lockdown conditions, with no access to communication, programming, rehabilitative resources, or even basic healthcare – are greater than necessary. Moreover, sentencing Mr. Marmolejo to

further prison time, where he is at greater risk of contracting COVID-19 and is subsequently at greater risk of serious illness or death, is greater than necessary to accomplish the goals of sentencing.

As the Center for Disease Control and Prevention (CDC) recognized, social distancing is simply "impossible to achieve in our federal prisons"– particularly during a lockdown.[43] Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities.

Unfortunately, nearly 11 months into the pandemic, as COVID-19 continues to ravage its facilities, BOP's ability to provide effective medical care has either not improved, or worsened. BOP also continues to fail to provide incarcerated individuals and staff adequate PPE to curb the spread of the virus.[44] The staff also regularly do not wear masks, or wear them improperly so as to render them ineffective.[45] The stark "reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Scparta*, 2020 WL1910481, at *3.

Because of COVID-19, any additional time Mr. Marmolejo spends in prison will necessarily be more severe than it ordinarily would. The Court should account for the oppressive

---

[43] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, *et al.*, to President Trump (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert- Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

[44] *See* Eric Katz, *Federal Prison Employees Fear Staff Shortages and Mass Reassignments as COVID-19 Cases Spike*, Government Executive (Dec. 1, 2020), https://www.govexec.com/workforce/2020/12/federal-prison-employees-fear-staff-shortages-and-mass-reassignments-covid-19-cases-spike/170399/ (BOP employees "said the bureau has failed to institute policies to protect them from the pandemic. After initially telling employees they were on their own for personal protective equipment, the bureau eventually opted to use UNICOR—the government-owned corporation that assigns manufacturing tasks to federal inmates—to make cotton masks for employees. They were issued the masks with a memorandum that stated there was no guarantee the product was 'effective against biohazards, including against contracting viral and bacterial illnesses.' Most workers opted to purchase their own equipment, employees said."); Letter from U.S. Rep. Salud Carbajal, U.S. Sen. Kamala Harris, and U.S. Sen. Dianne Feinstein to Michael Carvajal, Dir. Fed. Bureau of Prisons 1 (Apr. 21, 2020), https://bit.ly/36yB5LK; AFGE, *A BOP Officer Contracted Coronavirus. He was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA; Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020), https://bit.ly/2WNrsEy; James Call, *Correctional Officers File Complaint about Coronavirus at Federal Prison in Tallahassee*, Tallahassee Democrat (Apr. 18, 2020), https://bit.ly/3drQlfD.

[45] *See* Jane Wester, *Lawyers 'Terrified' to Return to Brooklyn's MDC Amid COVID-19 Outbreak, Federal Defenders Say*, New York Law Journal (Dec. 4, 2020), available at https://www.law.com/newyorklawjournal/2020/12/04/lawyers-terrified-to-return-to-brooklyns-mdc-amid-covid-19-outbreak-federal-defenders-say/?slreturn=20210021131525 ("[S]ome attorneys visiting inmates at the MDC and MCC had also raised concerns about BOP staff not wearing masks or wearing masks incorrectly."); Priscilla DeGregory, *Brooklyn lockup conditions deteriorating as COVID cases rise, lawyers claim*, New York Post (Dec. 7, 2020), available at https://nypost.com/2020/12/07/brooklyn-lockup-conditions-deteriorating-as-covid-cases-rise/ (Federal Defenders attorney says that "we continue to receive reports that staff are not wearing masks or wearing masks improperly" and "we also continue [to] have concerns about air quality at both the MDC and MCC.").

nature of BOP confinement by reducing his sentence and permitting him to be deported without serving additional jail time. *See, e.g., United States v. Sutton*, No. 07-426 (KSH), 2007 WL 3170128 (D.N.J. Oct. 25, 2007) (varying downward because of the overcrowded, unacceptable conditions at the pretrial facility); *United States v. Pacheco-Soto*, 386 F.Supp.2d 1198 (D.N.M. Sept. 9, 2005) (granting a departure because the defendant's deportable status results in conditions of confinement that are "severe and unfair").

This Court, as well many other judges in the Southern District of New York, has recognized that the threat of COVID-19 to incarcerated individuals constitutes an "extraordinary and compelling" reason for compassionate release as well as an important mitigating factor for sentencing. *See e.g., United States v. Cirino*, No. 19 Cr. 323 (JSR) (S.D.N.Y. July 17, 2020) (sentencing 35-year old defendant with no health issues to 10 months' imprisonment, where Guidelines range was 57-71 months, noting that "it is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); *United States v. Pina*, No. 18 Cr. 179 (JSR) (S.D.N.Y. June 29, 2020) (granting release to defendant who had served nearly 20 months of 39-month sentence, concluding that he was "experiencing increasingly severe mental distress as a result of the [COVID-19] lockdown procedures imposed at FCI Allenwood"); *United States v. Martinez*, No. 04 CR. 48-20 (JSR), 2020 WL 7128951 (S.D.N.Y. Dec. 4, 2020) (granting release to defendant with diabetes, hypertension, and asthma who had served 70% of sentence); *United States v. Henareh*, No. 11-CR-93-1 (JSR), 2021 WL 119016 (S.D.N.Y. Jan. 13, 2021) (granting sentence reduction to 63-year-old defendant with hypertension who had contracted and survived COVID-19 during the previous year). In *United States v. Ozols*, No. 16 Cr. 692 (JMF), 2020 WL 2849893 (S.D.N.Y. June 2, 2020), Judge Furman granted compassionate release for a 42-year-old defendant who completed 3/4 of his 39-month sentence, suffered from anxiety and depression, and was facing deportation. The Court, which had sentenced Mr. Ozols in February 2019, held in June 2020 that the §3553(a) factors had changed: "'[d]ue to the COVID-19 pandemic, the 'history and characteristics of the defendant' and the 'need . . . to provide the defendant with needed . . . medical care,' [they] now weigh heavily in favor of [] release, given the health risk that continued incarceration poses to him.'" (citing *United States v. Pena*, 15. Cr. 551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020)).[46]

In *United States v. Rodriguez*, this Court considered "the unique hardship and risk of severe illness imposed by the pandemic" in reducing the life sentence of Mr. Rodriguez, a prisoner at FCI Allenwood who suffered from ailments including obesity and diabetes. No. 00 CR. 761-2 (JSR), 2020 U.S. Dist. LEXIS 181004 (S.D.N.Y. Sep. 30, 2020). This Court reduced his sentenced to 30 years, recognizing that

---

[46] *See also United States v. Bayuo*, No. 15 Cr. 576 (JGK), 2020 WL 3415226 (S.D.N.Y. June 20, 2020) (granting release to ICE custody to defendant with diabetes and hypertension); *United States v. Vaughn*, No. 13 Cr. 867 (WHP), ECF Dkt. 102 (S.D.N.Y. July 21, 2020) (granting release to defendant at FCI Morgantown with hypertension, diabetes, and impaired kidney function); *United States v. Ramirez*, No. 19 Cr. 105 (LGS), ECF Dkt. 52 (S.D.N.Y. Aug. 6, 2020) (granting release to defendant at MDC Brooklyn with diabetes, hypertension, elevated cholesterol, and obesity who had served 18 months of a six-year sentence); *United States v. Britton*, No. 17 CR 260-LTS, 2020 WL 4586799 (S.D.N.Y. Aug. 10, 2020) (granting release to home confinement to 54-year-old defendant with diabetes and high blood pressure); *United States v. Fernandez*, No. 12-CR-844-9 (AJN), 2020 U.S. Dist. LEXIS 190157 (S.D.N.Y. Oct. 14, 2020) (granting release to defendant at Fort Dix with hypertension and diabetes).

the pandemic, aside from posing a threat to Rodriguez's health, has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as "prime candidates" for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal. For someone with Rodriguez's health profile, the risk of suffering severe health consequences if he contracts COVID-19, coupled to the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure Rodriguez's safety, means that "the actual severity of [Rodriguez's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."

*Id.* at \*7-8 (quoting *United States v. Al Kassar*, No. 07-cr-354-01(JSR), 2020 U.S. Dist. LEXIS 150558, at \*3 (S.D.N.Y. Aug. 19, 2020) and *United States v. Mel*, No. TDC-18-0571, 2020 U.S. Dist. LEXIS 74491, at \*10 (D. Md. Apr. 28, 2020).



Despite the horrors and medical neglect Mr. Marmolejo has continuously endured throughout his 13 months at MCC, his conduct and behavior while incarcerated has been exemplary.

When Mr. Marmolejo arrived at the MCC in December 2019, he registered for programs that were scheduled to begin in February 2020, including a business administration program and a plumbing program. Unfortunately, because of the COVID-19 pandemic, programming at MCC was put on hold. Mr. Marmolejo has signed up for what little programming has been made available during the pandemic, as he is always seeking to better himself and be productive as much as he can while incarcerated. He has thus far completed an American Bible Academy course, for which he received a grade of A+, and an African American history course.[97]

In August 2020, reflective of the positive opinion the staff at MCC hold of him, Mr. Marmolejo's case manager asked him if he wanted to be an orderly. The orderly position is understood to be one that is offered to individuals who are considered to be particularly trustworthy and responsible. Mr. Marmolejo took on the part-time orderly job, only one of two orderly positions available in his unit, and has so far received only positive reviews of his work performance.

e. █████████████████████



---

█ ██  Ex. B (American Bible Academy Certificate of completion and Grade Report). Mr. Marmolejo has not yet received a copy of his certificate of completion for the other courses he has taken at MCC; counsel will provide these to the Court if received before the sentencing date.
[98] ████████████████████████████████████████
[99] ████████████████████



Mr. Marmolejo also asks the Court to consider his role in the offense, and his relatively low place as a street-level dealer in the drug-trafficking hierarchy. Mr. Marmolejo's role in the offense was that of a low-level intermediary who received requests from a potential buyer (in this case, a government informant), and fulfilled the requests one at a time by purchasing the specific amount requested from his supplier, co-defendant Frank Medina. Drug-trafficking Guidelines ranges have been criticized for not being based on empirical data or the expertise of the United States Sentencing Commission (hereinafter the "USSC"), or the actual culpability of defendants.[104] Years after *Booker*, the USSC estimated that the most culpable drug traffickers, including high-level suppliers and importers, and managers and supervisors accounted for only 10.9% and 1.1% of drug cases, respectively.[105] Judge Gleeson similarly recognized that "only 6% of drug-trafficking defendants could be classified as managers or leaders, *i.e.* individuals occupying the highest rungs of a drug enterprise." *United States v. Leitch*, No. 11-CR-00609

---

[104] *See, e.g.*, Memorandum Explaining a Policy Disagreement with the Drug Trafficking Offense Guideline at 2, *United States v. Diaz*, No. 11-CR-00821-2 (JG), 2013 WL 322243, at *9, *18 (E.D.N.Y. Jan. 28, 2013) (Gleeson, J.).

[105] U.S. SENTENCING COMM'N, REPORT TO CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 167 (2011) (hereinafter the "Mandatory Minimum Report"), https://perma.cc/5EK6-PBXV. Moreover, the Mandatory Minimum Report indicates that "[a]mong those offenders who received relief from the mandatory minimum penalty by providing substantial assistance to the government, the Commission's analysis shows that offenders who performed high-level functions generally obtained relief for substantial assistance at higher rates than offenders who performed low-level functions." *Id.* at 171.

(JG), 2013 WL 753445, at *11 (E.D.N.Y. Feb. 28, 2013) (Gleeson, J.). Instead, since the Guidelines went into effect, federal prisons have been increasingly populated with underlings: couriers, mules, street-level dealers, and others. The sentencing table, however, was created with high-level kingpins in mind, based on the USSC's assumed link between drug quantity and culpability.[106] The result is that applying the Guidelines leads to extremely harsh and inconsistent sentencings for drug enterprise underlings. In other words, the Guidelines fail dramatically where drug-quantity-based calculations impose kingpin culpability levels on low-level actors such as couriers and street-level dealers. Quantity-based sentencing was based on mistaken Congressional assumptions that lengthy sentences would reach high-level drug traffickers.

### i.    Comparison to codefendant, Frank Medina

Mr. Marmolejo has one co-defendant in this case, Frank Medina, who was sentenced by this Court on August 3, 2020. On March 16, 2020, pursuant to a plea agreement, Mr. Medina pled guilty before Your Honor to a two-count indictment charging conspiracy to distribute and possess with intent to distribute heroin and possession with the intent to distribute cocaine, cocaine base, fentanyl and heroin. This conviction posed a 10-year mandatory minimum that Mr. Medina was able to bypass through safety-valve relief, and Your Honor sentenced him to 48 months imprisonment. Counsel submits that Mr. Marmolejo warrants a sentence much lower than Mr. Medina's, for multiple reasons. First, as the government and Court acknowledged at Mr. Medina's sentencing, Mr. Medina's conduct in this case was "extremely serious," as it involved the trafficking of not only heroin but also significant quantities of narcotics including cocaine and fentanyl. Further, both the Court and the government found particularly troubling the fact that Mr. Medina's conduct occurred from his home where his young children reside, endangering his family. Second, and perhaps more importantly, Mr. Medina has not reported that he has any health problems or has otherwise experienced any particularly onerous conditions of confinement. As detailed at length above, Mr. Marmolejo's experience while incarcerated pre-trial on this case has been a neverending series of horrific ordeals given his ███████████ ███████████████, and any continued incarceration will continue to pose an unacceptable and unnecessary risk to Mr. Marmolejo's health.

### f.  Mr. Marmolejo's Criminal History Category Is Overstated Because It Includes a Sentence for Offense Conduct that Occurred in the 1990's

---

[106] The first sentencing table was actually set above the mandatory minimum to enable prosecutors to leverage sentencing reductions in exchange for defendants' guilty pleas and cooperation. *See* Patti B. Saris, *A Generational Shift for Federal Drug Sentences*, 52 AM. CRIM. L. REV. 1, 6 (2015) (citing U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 5–6 (2002)). "The apparent intent of the [mandatory minimum legislation] was to increase sentences on *major* drug offenders. As Senator Robert Byrd stated: [¶] [A major drug offender] must know that there will be no escape hatch through which he can avoid a term of years in the penitentiary. . . . We divide these major drug dealers into two groups for purposes of fixing what their required jail terms shall be: For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum is 10 years. . . . Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail . . . a minimum of 5 years for the first offense." Barbara Meierhoefer, *The Severity of Drug Sentences: A Result of Purpose or Chance?*, 12 FED. SENTENCING REP. 34, 34 (1999) (quoting 132 CONG. REC. § 14301 (daily ed. Sept. 30, 1986) (statement of Sen. Byrd)).

The PSR calculates a criminal history category (CHC) III for Mr. Marmolejo, based on a criminal history score of six. Mr. Marmolejo does not dispute this calculation, but submits that his CHC overstates his criminal history because three of his six criminal history points come from a prior conviction and sentence that is based entirely on conduct that occurred and ended in 1994, in Florida. If Mr. Marmolejo had been prosecuted upon his arrest in that case (instead of released, and then prosecuted more than a decade later), the resulting sentence likely would not be counted in his criminal history score today,[107] leaving Mr. Marmolejo with a criminal history score of three, which would place him in CHC II. A CHC II, with Offense Level 27, would give him a Guidelines range of 78-97 months.

The conviction in question was entered upon a guilty plea[108] on March 2, 2006, in the Southern District of Florida, and the sentence was imposed on May 16, 2006, nearly 15 years ago. Mr. Marmolejo was sentenced to 48 months' imprisonment, and released from prison on April 17, 2009,[109] nearly 12 years ago. As it stands, this sentence nearly falls out of the 15-year time limit for counting three-point sentences. However, if the case had been timely prosecuted by the government in the 1990's, and Mr. Marmolejo had been sentenced back then rather than *12 years* after the conduct in question, the sentence would have most likely fallen well outside the 15-year time limit today.

In this Southern District of Florida case, Mr. Marmolejo had initially been arrested for the conduct covered by the indictment on November 29, 1994, by local police in Pembroke Pines, Florida, and charged by Florida state authorities, though the case was the subject of an ongoing federal DEA wiretap investigation. The state authorities dropped his case on December 21, 1994, and the government has explained (more than a decade later) that the state had agreed to this in order to permit the federal investigation to conclude.[110] Mr. Marmolejo, however, was led to believe that the case was over when it was dismissed in December 1994. He was released from custody after spending a couple weeks in jail. Not long after, believing that this case was completely behind him, he left Florida and ultimately returned to New York City with his mother and little sister.

Unbeknownst to Mr. Marmolejo, on March 29, 1995, a sealed federal indictment and arrest warrants for Mr. Marmolejo and his co-defendants were issued in the Southern District of Florida, based on the same conduct that Mr. Marmolejo had been arrested for in November 1994 by local Florida police. Because the indictment was sealed, Mr. Marmolejo was not aware of it. The indictment also misspelled his last name as "Marmalejo."

---

[107] *See* U.S.S.G. § 4A1.1(a), App. Note 1 (for three-point sentences, "[a] sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period.").

[108] Mr. Marmolejo pled guilty to 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate a drug trafficking offense).

[109] Mr. Marmolejo had begun serving this sentence on December 1, 2005.

[110] Specifically, the federal government explained in a court filing in 2006 that it believed that Mr. Marmolejo had been a member of a drug trafficking organization back then, in 1994, and that a state prosecution of Mr. Marmolejo at that time would have required exposure of the larger DEA investigation into the head of the organization and the remainder of its members. Consequently, state prosecutors agreed to defer any prosecution in order to permit the DEA investigation to conclude and for a planned comprehensive takedown. Govt's Response in Opposition to Motion to Dismiss Indictment, ECF No. 155, *United States v. Victor Marmolejo*, No. 95-CR-223 (S.D.Fla. Jan. 19, 2006), at 4.

More than a decade after his Florida arrest, to his great surprise, on November 16, 2005, Mr. Marmolejo was again arrested for the same conduct from 1994, this time on the federal warrant. On November 16, 2005, Mr. Marmolejo was living in Queens, New York and had voluntarily agreed to be interviewed by the DEA at its New York field office with regard to an unrelated homicide in NYC. During this interview, the DEA agents ran an arrest warrant check, which turned up the 1995 warrant from Florida, and arrested Mr. Marmolejo. Mr. Marmolejo was arraigned in the Eastern District of New York on November 17, 2005, then removed to the Southern District of Florida.

The delay in arresting and prosecuting Mr. Marmolejo in this Florida case was caused by the government's lack of diligence and good faith. In 1995, Mr. Marmolejo visited Colombia for several months, and returned to the US that same year. He had lost his physical green card when he was arrested in Florida in 1994, when it was taken from him and never returned, so that when he returned to the US from Colombia in 1995, he first visited the US embassy in Bogota. There, he was provided a document that he was instructed to present along with his passport when he entered the US, that would serve as proof of his green card status and permit him to enter. This is how he re-entered the US in 1995. For the next decade, Mr. Marmolejo resided continuously in the US and could have been easily found by the federal government.

Indeed, as reflected in his PSR, two years after the federal arrest warrants issued in the Florida case, Mr. Marmolejo was arrested by the FBI on a federal drug charge in Detroit, Michigan, in May 1997. He was held for 24-48 hours, made an initial appearance in the Eastern District of Michigan, and released on bond. The case was dismissed the next month due to unnecessary pre-indictment delay. Mr. Marmolejo recalls that, during the processing for this arrest, his fingerprints had been taken, and the former Detroit Federal Defenders who represented him confirmed that Mr. Marmolejo would have been fingerprinted by the FBI or US Marshals back then; it was standard procedure then for the arresting agency to fingerprint arrestees, and if the arrestee is then released as Mr. Marmolejo had been, the Marshals would also take fingerprints, so that there would be not just one but two sets of fingerprints.[111] Evidently, there were multiple lapses on the government's part in failing to pull up the federal warrant from Mr. Marmolejo's Florida case, and in failing to notify and apprehend Mr. Marmolejo on the warrant in a timely manner.

***Objection to Unsubstantiated and Prejudicial Allegations in PSR***

---

[111] *See also* https://www.fbi.gov/services/information-management/foipa/privacy-impact-assessments/firs-iafis ("Fingerprint identification has been a major responsibility of the FBI since 1924 and fingerprints have been a key part of the FBI's national criminal history record system.  The FBI's CJIS Division was established in February 1992 to serve as the focal point and central repository for criminal justice information services in the FBI.  It is the FBI's largest division and is responsible for administering several programs, including the Integrated Automated Fingerprint Identification System (IAFIS), the National Crime Information Center (NCIC), (including files of interest to law enforcement, such as those relating to wanted persons, civil protection orders, registered sex offenders, and missing persons), the national criminal history record index known as the Interstate Identification Index (III or "Triple I"), and the National Instant Criminal Background Check System (NICS) (which processes background checks on prospective purchasers of firearms from Federal firearms licensees).").



In fact, Mr. Marmolejo was at that very time enrolled in, with nearly perfect attendance, an intensive English language program at Fiorello H. LaGuardia Community College.[112]

There are other errors in the PSR's narrative. For example, in the first paragraph on page 9, it states that when Mr. Marmolejo was arrested on November 29, 1994, by Pembroke Pines Police Department, he was in possession of over 30 kilograms of heroin. However, the government's filings in that case repeatedly state that it was cocaine, not heroin. The PSR also incorrectly states that Mr. Marmolejo "was separately charged with possession with intent to distribute approximately 30 kilos of cocaine." The indictment in that case did not charge Mr. Marmolejo as responsible for 30 kilos of cocaine; rather, he was charged with conspiracy to possess with intent to distribute 1 kilogram or more of heroin and 5 kilograms or more of cocaine starting around August 1994, and possession with intent to distribute 5 kilograms or more of cocaine on November 29, 1994.

Mr. Marmolejo also disputes the PSR's claim that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on the sealed indictment in that case. This claim is unsubstantiated.

Mr. Marmolejo therefore moves to strike, from page 9 of the PSR, (1) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (2) the claim that Mr. Marmolejo ▮▮▮▮▮▮▮▮▮▮ and (3) the factual inaccuracies noted above.[113]

---

[112] *See* Ex. C (LaGuardia Community College Winter 2005 English Program Grade Report and Certificate of Attendance).

[113] In the alternative, Mr. Marmolejo requests that the Court "explicitly disavow any reliance on a controverted statement" in the PSR, and that "the fact of the dispute and the judge's non-reliance appear on the record and the

***Objection to Erroneous Inclusion of Arrest in "Other Arrests"***

The PSR erroneously indicates that Mr. Marmolejo was arrested on November 17, 2005 for the charge of "Illegal Reentry/Aggravated Felon" by U.S. Customs and Border Protection in New York, NY, and that this charge was combined with the Southern District of Florida case and dismissed on May 16, 2006, the day Mr. Marmolejo was sentenced in the Florida case. *See* PSR at 12-13. The government's plea offer in the present case had initially included in Mr. Marmolejo's criminal history a conviction for illegal reentry on or about January 31, 2006, that the government acknowledged was erroneous and removed from a subsequent revised plea offer. The government acknowledged that the error was the result of a mixup between Mr. Marmolejo and another individual. Counsel believes that the inclusion of the "illegal reentry/aggravated felon" charge in Mr. Marmolejo's criminal history is similarly in error.

## II.      *Under 18 U.S.C. § 3582(a) Additional Time in Prison Is Not Warranted*

The Pre-Sentence Report ("PSR") calculates a total offense level of 27, and places Mr. Marmolejo in Criminal History Category III. PSR, at 8, 11. The corresponding Guidelines range would be 87 to 108 months' imprisonment.

However, as detailed below, that calculation, and both the offense level and Criminal History Category to which it rigidly hews, prescribe a sentence in excess of that "sufficient but not greater than necessary" to achieve the purposes of sentencing enumerated in 18 U.S.C. §3553(a)(2).

The PSR does not engage in the relevant considerations under §3553(a), leaving that calculation to the Court to arrive at a sentence "sufficient but not greater than necessary" to achieve the goals listed in §3553(a)(2). 18 U.S.C. §3582(a) requires a sentencing court to "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation." *See United States v. Rosado*, 254 F.Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner.").

Not only does Mr. Marmolejo not need a prison sentence on top of the time he has served since December 2019 to be rehabilitated, but there is a growing understanding that prison

---

sentencing transcript is attached to the presentence report." *United States v. Berkman*, No. 83 Cr. 798 (CSH), 1988 U.S. Dist. LEXIS 4505, at *1 (S.D.N.Y. May 23, 1988). However, the reality is that anything short of deleting the allegations from the PSR will fail "to free the defendant, as he proceeds through the correctional system, of any onus or prejudice resulting from unproven government allegations which the trial court specifically refused to consider at the time of sentencing." *United States v. Berkman*, No. 83 Cr. 798 (CSH), 1990 U.S. Dist. LEXIS 13288, at *12 (S.D.N.Y. Oct. 3, 1990). Experience has shown it is likely that, down the line, the Court's decision to not delete the allegations from the PSR will be "erroneously interpreted . . . as an indication that the allegations were accurate," so that Mr. Marmolejo will continue to face further punishment based on the inflammatory nature of these wholly unsubstantiated allegations. *United States v. Rosenberg*, 108 F. Supp. 2d 191, 211-12 (S.D.N.Y. 2000); *see also Patterson v. Gunnell*, 753 F.2d 253, 255-56 (2d Cir. 1985).

overcrowding, as a result of reflexively long Guidelines sentences, and especially in light of the COVID-19 pandemic, needs to be addressed.

Drug offenders, including nonviolent offenders like Mr. Marmolejo, have borne the brunt of this expanded and excessively punitive system. The Bureau of Justice Statistics reported in 2015 that "offenders whose most serious offense (as defined by the BOP) was a drug offense accounted for more than half (52%) of the federally sentenced prison population."[114] Today, drug offenses account for 46.2% of individuals serving a sentence in the Bureau of Prisons.[115] And the harsh sentencing of drug offenses has contributed to the broader growth of mass incarceration.

> [A] large portion of the growth in state and federal imprisonment is due to the increased number of arrests for drug offenses and the increased number of prison commitments per drug arrest. Law enforcement efforts targeting drug offenses expanded greatly after the 1970s, with the arrest rate for drugs increasing from about 200 per 100,000 adults in 1980 to more than 400 per 100,000 in 2009 (Snyder, 2011). Sentencing for drug offenses also became more punitive, as mandatory prison time for these offenses was widely adopted by the states through the 1980s and incorporated in the Federal Sentencing Guidelines in 1986.[116]

With respect to drug trafficking, there has been very little empirical evidence to show that higher sentences promote the overarching goal of the sentencing guidelines, which is prevention. One striking example is with the price of drugs. While it is thought that increased enforcement and removing sellers from the street increases prices, and thus reduces demand, "[t]here is surprisingly little evidence that additional enforcement of any kind, at the margin, appreciably raises drug prices. The striking decline in US street cocaine and heroin prices (adjusted for purity) between 1980 and 2005—a period in which incarceration risk rose by perhaps an order of magnitude—provides the most troubling data-point."[117]

A "tough on crime" approach, with long sentences, is not effective in preventing overdoses either. As *Vox* reported in 2017:

> There's a simple logic to this: America has been deploying 'tough on crime' policies for decades, yet that didn't prevent the deadliest drug overdose epidemic in the country's history. The drug war policies were supposed to crack down on the supply of drugs by pushing out sellers, therefore making the substances more expensive and, as a result, less

---

[114] Bureau of Justice Statistics, Special Report: Drug Offenders in Federal Prison: Estimates of Characteristics Based on Linked Data, 2015.

[115] *See* https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last updated Sept. 5, 2020).

[116] *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* 2014. Washington, DC: The National Academies Press, at 152.

[117] Harold A. Pollack and Peter Reuter, "Does tougher enforcement make drugs more expensive?" *Society for the Study of Addiction* (2014), https://reuter.it-prod-webhosting.aws.umd.edu/sites/default/files/reuter/files/pollack_and_reuter.pdf, at 2.

accessible. But since 1981, the price of heroin per pure gram has actually
dropped by more than 85 percent.

. . .

"Expecting that you're going to change the behaviors of the retailers with
those sentences is just cognitively unrealistic with the way we fallible
mortals process benefits and consequences and make decisions," [Jon]
Caulkins[, a drug policy expert at Carnegie Mellon University,] said. "It's
symbolic at some level; it's an expression of our outrage and frustration.
It's not very practical."

To the extent these laws do at least remove drug traffickers from the streets, those dealers
are merely replaced with others — so there isn't even a significant incapacitation effect. A 2009
review of the research by the RKC Group, funded by the Colorado Criminal Justice Reform
Coalition, backed this up. It concluded, "Simply put, the market responds to the demand for
drugs by replacing drug sellers sent to prison with either new recruits or by the increased drug
selling of dealers already in the market. As a result, the incapacitation effect found for some
other offenses is largely nullified in the case of drug dealing."[118]

As Judge Garaufis has stated, "[a]ny amount of prison time is a serious amount of prison
time."[119] The time Mr. Marmolejo has already spent incarcerated, with the exceptionally harsh
conditions he has endured throughout his entire 13-month pre-trial detention, has served a more
than sufficient punishment and deterrent for Mr. Marmolejo to not commit additional crimes and
to be held accountable for his conduct in this case. Finally, the collateral consequences of this
conviction are significant—Mr. Marmolejo will be deported. He faces additional time in
immigration custody upon his release in this case before his deportation.

Mr. Marmolejo's goal is to be reunited with his aging father in Colombia and finally
pursue his long-time dream of working in interior design. He has been studying interior design
while at MCC, as well as focusing on yoga, meditation, and achieving inner peace in the most
difficult of circumstances. Continuing his incarceration would only prolong the already severe
trauma he has experienced and will serve no additional rehabilitative or deterrent purpose.

For the reasons set forth above, it is respectfully requested that Victor Marmolejo be
sentenced to time served and a period of supervised release as determined by the Court. Mr.
Marmolejo and his family are grateful for the Court's consideration of mercy.

Sincerely,

Susan K. Marcus, Esq.

---

[118] German Lopez, "The New War On Drugs," *Vox* (Sept. 13, 2017), https://www.vox.com/policy-and-politics/2017/9/5/16135848/drug-war-opioid-epidemic.

[119] *United States v. Johnson*, 2018 U.S. Dist. Lexis 71257, at *19 (E.D.N.Y. Apr. 26, 2018).